IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

METROPOLITAN LIFE INSURANCE COMPANY,

    *Plaintiff*,

v.

OLGA A. BRATTON and MARIO T. GLOVER, SR.,

    *Defendants*.

Civ. No. 16-390-MPT

Tiffany M. Shrenk, Esquire of MacElree Harvey Ltd., Centerville, Delaware. Counsel for Defendant Olga A. Bratton.

Lydia E. York, Esquire of Mattleman, Weinroth & Miller, P.C., Wilmington, Delaware. Counsel for Defendant Mario T. Glover, Sr.

## ARBITRATION DECISION

Dated: July 24, 2018
Wilmington, Delaware

THYNGE, Chief Magistrate Judge:

Thomas A. Bratton ("Thomas") passed away on February 13, 2016 at the age of 90.[1] Thomas is survived by a wife, two step-sons, and several siblings. The issue in this arbitration dispute is whether the proceeds from the only asset of value in Thomas' estate, a life insurance policy, should go to his widow Olga A. Bratton ("Olga") or one of his brothers, Mario T. Glover ("Mario"). A one-day arbitration hearing was held in this matter on December 4, 2017. The court has original jurisdiction pursuant to 29 U.S.C. § 1132(e)(l) and 28 U.S.C. § 1331, because the action arises under the Employee Retirement Income Security Act of 1971, as amended.

## I. BACKGROUND

### A. The Bratton Family

Thomas had four siblings from his parents' marriage, and a second set of siblings from when his mother remarried. (Hr'g Tr. at 69:8-70:4). Among the second set of siblings is Mario and Clarence. (Id.). Due to a thirty year age difference, Thomas did not grow up with Mario and Clarence. (Id.; Hr'g Tr. at 162:24-163:1).

Thomas married Olga in 1959. (D.I. 29-1, Tab 2 at 3:21-4:1). During their marriage, there were never any periods of separations or divorce, and they always lived in the same house. (Hr'g Tr. at 70:13-21). Thomas and Olga did not have any biological children. (Id. at 69:5-6). But at the time of her marriage to Thomas, Olga had two children, Wayne Darden ("Wayne") and Kerry Darden ("Kerry"), from a prior marriage, who were nine and thirteen, respectively. (D.I. 29-1, Tab 2 at 4:8-15; Hr'g Tr. at 67:21-23). Thomas never legally adopted Olga's sons, but they grew up with him in a father/son relationship, and he referred to them as his sons. (Hr'g Tr. at 67:8-12, 68:9-69:4).

---

[1] Several individuals in this action share the same last name. Accordingly, to avoid confusion, this decision uses first names.

1

Olga has a high-school education and worked in a grocery store for forty-three years until she retired. (Hr'g Tr. at 70:22-24). Thomas had a high-school education and worked as the manager of a liquor store. (*Id.* at 71:1-6). Then in the late 1960s, Thomas went to a computer school and afterwards was employed at MetLife working with computers. (*Id.* at 71:6-10). Thomas stayed at MetLife until his retirement in the late 1980s. (*Id.*). After retirement, Thomas worked doing laundry and cleaning houses for about five years to keep himself busy. (*Id.* at 71:10-72:1). In 2007, when the Brattons were in their early eighties, they moved from New York to Delaware. (Hr'g Tr. at 67:24-68:2, 72:2-10). The Brattons' children and grandchildren live in New York, while Thomas' brothers, Mario and Clarence, live in Delaware. (Hr'g Tr. at 72:25-73:9).

**B. Mario Manages the Brattons' Finances**

In 2013, the Brattons were having difficulty managing their household finances, so Mario began to assist the Brattons with paying their bills. (Hr'g Tr. at 76:2-9, 113:13-16). Mario was to use the Brattons' money to pay their bills and pay them on time. (*Id.* at 107:18-24). Notably, Mario had his own financial difficulties around the same time. Mario's employer, Yellow Cab was abruptly sold, leaving him unemployed for a period of time. (*Id.* at 136:8-137:5). As a result, Mario asked Olga for a loan, which she provided. (*Id.*). Olga confided in others that she loaned Mario some money and he never paid her back. (*Id.* at 48:17-20). Thomas also loaned money to Mario when he needed it. (*Id.* at 28:18-19, 60:21-61:5). In 2013, before Mario began managing the Brattons' finances, he filed for bankruptcy. (*Id.* at 155:21-156:20).

Sharon Madison ("Madison") witnessed the Brattons' declining health over the last few years of Thomas' life. Madison is the wife of Thomas' barber, John Fields ("Fields"), and first

met the Brattons in October 2014. (Hr'g Tr. at 22:16-22). She regularly visited the Brattons thereafter and described their living conditions upon first meeting them as "not good." (*Id.* at 23:5-16). Their home was very messy, particularly from bladder accidents that Thomas experienced which left stains on the carpet "in front of where he always sat." (*Id.* at 23:14-23). Olga had not left the house in two years except to attend doctors' appointments. (*Id.* at 23:24-24:5). The Brattons' mailbox was overflowing, because it had not been checked. (*Id.* at 25:13-25).

In May 2015, both Thomas and Olga were admitted to the hospital and then to Churchman's Village for rehabilitation. (Hr'g Tr. at 27:15-24). Sometime during this period, Mario had a conversation with Thomas about his funeral arrangements. Thomas asked Mario to handle his funeral arrangements and told Mario that he had a life insurance policy with MetLife worth $42,000 that could cover his funeral expenses. (*Id.* at 143:8-144:13). Thomas and Mario did not discuss how much they expected the funeral to cost, but the actual funeral expenses were between $10,000 and $12,000. (*Id.* at 143:18-21). Thomas never said that he was gifting the life insurance policy to Mario. (*Id.* at 157:25-158:4). With Mario's assistance, Thomas called MetLife and asked that a change of beneficiary form be mailed to him. (*Id.* at 144:24-146:11). Neither Thomas nor Mario discussed the change of beneficiary form with anyone else. (*Id.* at 157:14-16).

### C. Mario Is Appointed Power of Attorney Over Thomas

At some point, Thomas complained to Fields that Mario was not timely paying the Brattons' bills and, to a degree, taking advantage of him. (Hr'g Tr. at 59:25-61:5). Madison testified that "there was always a problem that was going on with the bills." (*Id.* at 40:1-8). In one month, the electric bill was $700 with a disconnect notice attached. (*Id.*).

Nevertheless, on July 14, 2015, Thomas executed a General Durable Power of Attorney that appointed Mario as his agent. (D.I. 29-1, Tab 9). Thomas told Wayne that he was making Mario his power of attorney because "he's down here." (Hr'g Tr. at 76:10-19). Mario never discussed any of Thomas' finances with anyone else in the family. (*Id.* at 157:14-20). Mario used the power of attorney to open an individual bank account in Thomas' name and transferred money from the Brattons' joint account to the new individual account. (*Id.* at 147:7-19). The power of attorney gave Mario access to Thomas' individual bank account. (*Id.*).

### D. Thomas Returns to the Hospital in the Fall of 2015

In the fall of 2015, Thomas was admitted to Christiana Hospital for swelling in his lower extremity. (Hr'g Tr. at 32:14-23). When Madison visited Thomas in the hospital, Thomas asked Madison how Olga was doing: whether she was eating, using the bathroom, sleeping, etc. (*Id.* at 33:1-5). Madison had the idea of recording a video message from Thomas to Olga. (*Id.*). In the video message, Thomas told his wife that "this was the best 56 years he ever had . . . and how much he loved her and adored her and she was the best thing to ever happen to him." (*Id.* at 33:11-17). Madison took the video to Olga and played it for her. (*Id.*).

On October 2, 2015, Thomas was discharged from the hospital and admitted to Churchman's Village. (D.I. 29-1, Tab 6). While Thomas was at Churchman's Village, Madison and Olga visited about three times a week. (Hr'g Tr. at 33:21-34:3). Wayne accompanied them on some of their visits. (*Id.* at 34:5). On October 21, 2015, a psychologist at Churchman's Village completed an evaluation of Thomas. (D.I. 29-1, Tab 6C). In the evaluation, Thomas told the psychologist that his "biggest source of comfort [and] support" was his "wife and sons." (*Id.*).

### E. Thomas Signs a Change of Beneficiary Form

When Thomas first selected beneficiaries for his life insurance policy in 1988, he elected Olga as the primary beneficiary and his two stepsons, Kerry and Wayne, as the contingent beneficiaries. (D.I. 29-1, Tab 4). On November 9, 2015, Mario arranged for Clarence to take Thomas to the bank to sign a change of beneficiary form for the life insurance policy. Thomas was still admitted to Churchman's Village, so there are contemporary medical notes of his mental and physical condition around this time. Specifically, a registered nurse noted in his chart that, on November 4th, Thomas had "periods of confusion and forgetfulness," on November 6th, he had "confusion" but was "able to make needs known to staff," on November 9th, Thomas was "alert and verbal with forgetfulness" but "able to verbalize needs to staff" and, on November 10th, he was "alert with confusion." (D.I. 29-1, Tab 6B).

At the bank on November 9, 2015, Thomas went into a conference room while Clarence waited in the lobby. (Hr'g Tr. at 9:23-10:3). In the conference room was Mario, a notary, and a witness from the bank. (*Id.* at 130:1-3). At that time, Thomas executed a Will, an Advance Healthcare Directive, and a change of beneficiary form for his MetLife life insurance policy. (D.I. 29-1, Tabs 5, 7, and 8). The Will had been drafted by an attorney based on a questionnaire mailed to Mario; Mario filled out the questionnaire with input from Thomas and mailed it back to the attorney. (Hr'g Tr. at 124:8-21). The attorney who drafted the Will was not present at this meeting. There is also no evidence that the attorney who drafted the Will ever met with Thomas, discussed with him how he would like to dispose of his estate, or advised him on how to arrange for the payment of his funeral expenses. The Will leaves all of Thomas' estate—except a gold ring, a Navy ring, watches, camera and camera equipment, and tools and tool box—to his wife, Olga, and to Wayne and Kerry if Olga did not survive him. (D.I. 29-1, Tab 5).

5

On the return to Churchman's Village, Clarence and Thomas did not discuss what happened at the bank, with the exception that Thomas told Clarence "I left you my toolbox." (D.I. 29-1, Tab 3 at 10:12-16). Clarence never saw what Thomas signed. (*Id.* at 11:17-12:3). Thomas was not given a copy of the documents he signed. (Hr'g Tr. at 34: 14-21). Mario kept the executed documents and mailed the change of beneficiary form to MetLife. (*Id.* at 135:14-19).

**F. Thomas Cannot Explain What He Signed**

A few days after the trip to the bank, on November 12, 2015, Thomas was discharged from Churchman's Village. (D.I. 29-1, Tab 6). He returned home and was placed on hospice care.[2] (Hr'g Tr. at 35:24-36:9). Wayne knew Clarence had taken Thomas somewhere on November 9th, because Wayne had arranged to have a wheelchair available for the trip. (*Id.* at 85:17-86:4). When Wayne asked his father where Clarence took him, Thomas advised that he went to the bank and signed some papers. (*Id.* at 86:10-15). When Wayne asked him "what kind of papers?," Thomas replied: "I signed a lot of papers." (*Id.*). Since Thomas could not elaborate on what he had signed and Wayne suspected Thomas did not know what he had signed, they called Mario to have him bring over the "papers." (*Id.* at 86:16-24). Several weeks passed, however, and Mario did not provide the papers before Wayne left Delaware due to other commitments. (*Id.* at 86:25-87:4).

Sometime during this period, Thomas told Madison that "he had signed some paperwork and he did not know what it was, and he wanted to get [Mario] on the phone" and ask him to bring the papers. (Hr'g Tr. at 36:21-37:25). They repeatedly called Mario but were unable to reach him. (*Id.*).

---

[2] Thomas may have already been on hospice care before his Fall 2015 admission to Churchman's Village. Madison testified that Thomas was on hospice care when she first met the Brattons. (Hr'g Tr. at 54:21-23).

6

### G. Olga Finally Learns of the Change in Beneficiary Form

Around Christmas 2015, Thomas developed a nodule on the side of his ear, and was taken to the hospital in pain. (Hr'g Tr. at 37:18-38:11). After that hospitalization, Thomas "just began to go down from there." (*Id.* at 38:25-39:2). He passed away on February 13, 2016 at the age of 90. (D.I. 29-1, Tab 10). After Thomas' death, Madison and Wayne called Metlife to file a claim for the life insurance proceeds on Olga's behalf. (Hr'g Tr. at 45:22-46:13). At this time, they learned for the first time that the beneficiary on the policy had been changed from Olga to Mario. (*Id.* at 46:9-19). Olga inherited nothing but debt from Thomas' estate. (*Id.* at 93:16-24). The Brattons' Delaware house was mortgaged in excess of the value of the property and was foreclosed on by the mortgage company following Thomas' death. (*Id.* at 78:2-79:4, 103:12-22).

## II. DISCUSSION

"The courts generally conclude that the law governing the mental capacity sufficient to execute a will applies to insurance cases." *Tracy v. Prudential Ins. Co. of Am.*, 101 A.2d 321, 323 (Del. Ch. 1953). "Under Delaware law, a will should not lightly be set aside on the grounds of lack of testamentary capacity." *In re Estate of Bickling*, 2004 WL 1813291, at *7 (Del. Ch. Aug. 6, 2004). In Delaware, the standard for testamentary capacity is that:

> [O]ne who makes a will must, at the time of execution, be capable of exercising thought, reflection and judgment, and must know what he or she is doing and how he or she is disposing of his or her property. The person must also possess sufficient memory and understanding to comprehend the nature and character of the act.

*In re Estate of West*, 522 A.2d 1256, 1263 (Del. 1987). "Delaware law presumes that the [testatrix] had sufficient testamentary capacity when executing her will, and the party attacking testamentary capacity bears the burden of proof." *Id.*

The record reflects some deficiencies in Thomas' physical and mental capacity. By 2014, he was no longer driving, managing his own finances, or properly caring for himself or his

home. (Hr'g Tr. at 23:14, 76:2-9; 113:13-16; 137:9-138:2). Around the time that he signed the change in beneficiary form, Thomas exhibited periods of confusion and forgetfulness. (D.I. 29-1, Tab 6B). In addition, after signing the change in beneficiary form, Thomas could not explain to Wayne or Madison what he had signed. (Hr'g Tr. at 36:21-37:25, 85:17-86:24). At the same time, the medical notes from around November 9, 2015 state that Thomas was able to verbalize his needs. (D.I. 29-1, Tab 6B). There is no indication in the medical record of Alzheimer's disease, dementia, or delusions. (*See Id.*). In addition, Thomas was aware of his property and how it was being disposed when he told his brother Clarence on November 9th, "I left you my toolbox." (D.I. 29-1, Tab 3 at 10:12-16). Ultimately, "only a modest level of competence is required for an individual to possess the testamentary capacity to execute a will." *West*, 522 A.2d at 1263. Therefore, with some hesitation, I find that Thomas' inability to explain what he signed is not enough on this record to demonstrate that he lacked testamentary capacity.

Nevertheless, this arbitration dispute should be resolved in Olga's favor on the grounds of reformation. "A donative document [such as a life insurance policy], though unambiguous, may be reformed to conform the text to the donor's intention if it is established by clear and convincing evidence (1) that a mistake of fact or law, whether in expression or inducement, affected specific terms of the document; and (2) what the donor's intention was." Restatement (Third) of Property (Wills & Don. Trans.) § 12.1 (2003); *Matters of Estate & Trust of Kalil*, 2018 WL 793718, at *9 (Del. Ch. Feb. 7, 2018). "A mistake in the inducement arises when a donative document includes a term that was intended to be included or fails to include a term that was not intended to be included, but the intention to include or not to include the term was the product of a mistake of fact or law." Restatement (Third) of Property (Wills & Don. Trans.) § 12.1 cmt. i (2003).

8

Here, there is clear and convincing evidence that Thomas did not intend for Mario to receive the net proceeds of the life insurance policy after paying for the funeral expenses. It was understood by Thomas and Olga that Mario would be responsible for making Thomas' funeral arrangements, and that Mario would use Thomas' money to pay any funeral bills, just as Mario had used Thomas' money to pay the Brattons' household bills. (Hr'g Tr. at at 121:12-16, 126:6-9). With respect to paying the funeral costs, Thomas "did not have [a] large amount of money." (Hr'g Tr. at 152:15-16). When Thomas died, his estate consisted entirely of debt. (*Id.* at 93:16-24). As Thomas likely knew, the only asset he possessed to cover the expenses of his funeral was his life insurance policy. Mario repeatedly testified at the arbitration hearing that Thomas requested the change of beneficiary form so that Mario could use Thomas' money to pay the funeral bills. (*Id.* at 143:14-17, 158:5-9). Thomas and Mario did not discuss the possible costs of his funeral arrangements, only the amount of his life insurance policy. (*Id.* at 143:18-21). No attorney advised Thomas regarding the consequences of changing the beneficiary of his life insurance policy. (*Id.* at 146:2-6). Further, Thomas had a high school education and some trade school training. (*Id.* at 71:1-6). As a result, there is no evidence that Thomas understood that there would be net proceeds from his life insurance policy after his funeral expenses were paid and that, under the change in beneficiary form, Mario rather than the primary beneficiary of his Will, Olga, would receive those net proceeds.

There is clear and convincing evidence in the record that Thomas did not intend to favor his brother Mario over his wife Olga, or to leave Olga with nothing but debt. Thomas originally named Olga as the primary beneficiary of his life insurance policy. (D.I. 29-1, Tab 4). Thomas named Olga as the primary beneficiary under his Will, which was executed at the same time as the change in beneficiary form. (D.I. 29-1, Tab 7). Under the terms of the Will, Mario received

9

only a specific bequest of a camera and camera equipment. (*Id*). Thomas and Olga had been married for over fifty years and were in a very loving and caring relationship. (D.I. 29-1, Tab 2 at 3:21-4:1; D.I. 29-1, Tab 6C; Hr' Tr. at 33:1-17). Thomas looked to Mario primarily to handle his financial and legal arrangements. Thomas had no history or pattern of gifting money to Mario. When Mario needed money, the Brattons would give him a loan. (*Id*. at 28:18-19, 48:17-20, 60:21-61:5). Thomas never indicated that he intended to gift the insurance policy to Mario. (*Id*. at 158:5-9). Considering all of the foregoing, I find that Thomas executed the change in beneficiary form on November 9, 2015, changing the primary beneficiary of his MetLife insurance policy from Olga to Mario, under a mistaken inducement that was the product of a mistake of law and fact.

### III. CONCLUSION

For the foregoing reasons, I find that the November 9, 2015 change in beneficiary form executed by Thomas A. Bratton is invalid. The rightful beneficiary of Thomas A. Bratton's MetLife life insurance policy is his surviving spouse, Olga A. Bratton. The funds deposited with the court by MetLife shall be released to Olga A. Bratton.

Dated: July 24, 2018

CHIEF MAGISTRATE JUDGE